**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HUDA JAFAR, | : | No. 3:04cv862 |
| Plaintiff | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | |
| KINGS COLLEGE, | : | |
| Defendant | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

**MEMORANDUM**

Presently before the Court for disposition is Defendant King's College's Motion for Summary Judgment on Plaintiff's employment discrimination complaint. This matter has been fully briefed and is ripe for disposition. For the following reasons, we will grant the motion and dismiss this case.

**I.    Background**[1]

Plaintiff Huda Jafar is of Palestinian descent and ancestry. She was enrolled in the Physician Assistant Masters Program at Defendant King's College ("Kings") until June 16, 2003, when Kings dismissed her from the program.

The program consists of a classroom portion, a clinical portion, and a masters paper. The clinical portion consists of seven six week clinical rotations and a three and a half month preceptorship. (Pl Ex. 2, Frances Feudale Dep. 20.) To pass a rotation, students must achieve a grade point average (GPA) of no less than 3.0. (Feudale Dep. 20.) The rotation

---

[1] The following background facts are derived from the evidence in support and in opposition to summary judgment. Where no exhibit is cited, the fact is uncontested.

grade is calculated based on a number of grades within the rotation, including the grades on paperwork, the rotation paper, the take-home exam, an evaluation by the rotation preceptor, and the end of rotation exam. (Feudale Dep. 28-29.) Furthermore, the student's cumulative GPA at the end of the year must be at least 3.0 to graduate with a masters. (Feudale Dep. 20.)

The first time a student completes a rotation with a GPA of less than 3.0, she is placed on clinical alert. (Feudale Dep. 21.) The second time, she is placed on clinical probation. (Feudale Dep. 21.) The third time is grounds for dismissal. (Feudale Dep. 21.)

Generally, the first two times a student receives a rotation grade of less than 3.0, she need not re-take the rotation and is merely placed on clinical alert or probation. (Feudale Dep. 22.) In some cases where the student has mental or psychological problems, Kings may require that she repeat the rotation. (Feudale Dep. 22.) This option, called remediation, is allowed on an individual basis depending on the student's circumstances. (Feudale Dep. 45.) By school policy, if a student resubmits a paper for remediation, the maximum grade is 3.0. (Feudale Dep. 54.)

Jafar failed to achieve a 3.0 GPA in her first two rotations, and was placed on clinical alert and then academic probation. (Feudale Dep. 27.) She then achieved a 3.0 in rotations three, four, and five. (Feudale Dep. 27.)

In the fourth and five rotations Jafar received a 4.0 grade on her rotation papers. (Pl. Ex. 1, Barbara Sauls Dep. 83.) These papers were graded by Diana Easton, and Easton did

2

not correct Jafar's formatting, referencing, or citations. (Pl. Ex. 4, Diane Easton Dep. 53.)

Dr. Barbara Sauls graded her sixth rotation paper and gave her a 2.0. (Sauls Dep. 84.) Dr.

Sauls reduced her grade because she made numerous formatting and citation errors, and

explained that but for these errors she could have received an "A." (Sauls Dep. 102.) By

failing to cite, Jafar did not attribute ideas or data to her sources, which Dr. Sauls equated to

plagiarism. (Sauls Dep. 85-86.) Dr. Sauls was consistently strict with all students regarding

format and citation errors, whereas Mrs. Easton was consistently lenient. (Feudale Dep. 60-

61.) Thus, students would receive discrepancies in their grades depending on whether Dr.

Sauls or Mrs. Easton was the grader. (Feudale Dep. 60.)

Because she received a 2.0 on the rotation paper, Jafar's overall GPA for rotation six

was 2.64. Since she was on probation, her failure to achieve a 3.0 constituted grounds for

dismissal. Instead of dismissing her, Dr. Frances A. Feudale, the Program Director,[2] wrote a

letter to Jafar offering remediation for rotation six. (Pl. Ex. FF-1.) Therein, she explained

that the paper format in rotation six was incorrect. (Pl. Ex. FF-1.) She noted that the same

errors were present in her masters paper. (Pl. Ex. FF-1.) Dr. Feudale acknowledged that the

school failed to notice her formatting problems earlier, but she assured Jafar that she "would

not be penalized for our past errors." ( Pl. Ex. FF-1.) Dr. Feudale thereafter explained that

Jafar had to re-submit the rotation paper, and then she could retake the end of rotation exam.

(Pl. Ex. FF-1.) Dr. Feudale warned that the highest possible score on the resubmitted paper

---

[2] Dr. Frances A. Feudale, D.O. was the assistant program director from May of 2001 to
August of 2001, when she was promoted to program director. (Feudale Dep. 6).

would be a 3.0, and she needed a minimum score of 54 on the remedial exam. (Pl. Ex. FF-1.)

Jafar, however, did not resubmit her rotation paper, but instead submitted her masters paper with corrections.  (Feudale Dep. 79, 81-82.)  Mrs. Easton advised Dr. Feudale that Jafar had apparently misunderstood the direction in the letter because she submitted the wrong revised paper.  (Feudale Dep. 82.)  Dr. Feudale did not give Jafar the opportunity to correct this misunderstanding because she believed her letter was clear.  (Feudale Dep. 83.) The letter stated, "After you do this you can re-submit the rotation paper for re-grading."  (P-FF-1.)  In addition, Jafar failed her end-of-rotation exam upon re-examination.  (P-BLS-2.) She needed a 54, but scored only a 52. (P-BLS-2.)  After Jafar failed to achieve a 3.0 GPA for rotation six following remediation, she was dismissed from the program.

## II.    Jurisdiction

The Court exercises jurisdiction over this dispute pursuant to its federal question jurisdiction, 28 U.S.C. § 1331, because Plaintiff seeks relief pursuant to 42 U.S.C. § 1981.

## III.   Standard

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v.</u>

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in

the light most favorable to the party opposing the motion. <u>International Raw Materials, Ltd.</u>

<u>v. Stauffer Chemical Co.</u>, 898 F.2d 946, 949 (3d Cir. 1990).  The burden is on the moving

party to demonstrate that the evidence is such that a reasonable jury could not return a verdict

for the non-moving party. <u>Anderson</u>, 477 U.S. at 248 (1986).  A fact is material when it

might affect the outcome of the suit under the governing law. <u>Id.</u>  Where the non-moving

party will bear the burden of proof at trial, the party moving for summary judgment may meet

its burden by showing that the evidentiary materials of record, if reduced to admissible

evidence, would be insufficient to carry the non-movant's burden of proof at trial. <u>Celotex v.</u>

<u>Catrett</u>, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the burden

shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts

by the use of affidavits, depositions, admissions, or answers to interrogatories showing that

there is a genuine issue for trial. <u>Id.</u> at 324.

## IV.    Discussion

Jafar claims that Kings dismissed her from the Physician's Assistant Program in

violation of 42 U.S.C. § 1981.  "Section 1981 prohibits 'racial' discrimination in the making

of private and public contracts." <u>Pamintuan v. Nanticoke Mem'l Hosp.</u>, 192 F.3d 378, 385

5

(3d Cir. 1999).[3]  Courts analyze Section 1981 claims under the analysis announced in

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Id.

   Under McDonnell Douglas, the plaintiff must first make a prima facie showing of

discrimination.  Pivirotto v. Innovative Systems, Inc.,191 F.3d 344, 352 n.4 (3d Cir. 1999).

If the plaintiff does establish a prima facie case, the burden of production shifts to the

defendant and requires that it produce some evidence of a legitimate, nondiscriminatory

reason for the adverse action.  Id.  Once the defendant does so, the plaintiff must prove by a

preponderance of the evidence that the proffered nondiscriminatory reason was pretext and

discriminatory animus was the actual reason for the action.  Id.

   We will assume, arguendo, that Jafar can establish a prima facie case because "most

[discrimination] cases turn on the third stage, i.e. can the plaintiff establish pretext."  Jones v.

Sch. Dist., 198 F.3d 403, 410 (3d Cir. 1999).   Kings proffers Jafar's repeated academic

failures as the reason for her dismissal from the program, and Jafar contends that this reason

is pretext for discrimination.

   A plaintiff can create a genuine issue of material fact that the nondiscriminatory

explanation is pretext "only if he submits evidence from which a factfinder could reasonably

either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an

invidious discriminatory reason was more likely than not a motivating or determinative cause

---

   [3] "All persons within the jurisdiction of the United States shall have the same right in every
State and Territory to make and enforce contracts."  42 U.S.C. § 1981.

of the employer's action."[4]  Connors v. Chrysler Financial Corp., 160 F.3d 971, 974 n.2 (3d

Cir. 1998).  Under the first option, "a plaintiff can cast sufficient doubt on a defendant's

legitimate non-discriminatory reason by showing 'weaknesses, implausibilities,

inconsistencies, incoherences, or contradictions in the employer's proffered legitimate

reasons for its action [such] that a reasonable fact finder could rationally find them unworthy

of credence.'" Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir.

1996) (quoting  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)).  A

plaintiff can demonstrate that discrimination was a motivating cause if, "[f]or example, the

plaintiff may show that the employer has previously discriminated against [the plaintiff], that

the employer has previously discriminated against other persons within the plaintiff's

protected class, or that the employer has treated more favorably similarly situated persons not

within the protected class."  Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998)

(citing Fuentes, 32 F.3d at 765).

    Jafar argues that Kings should have provided further accommodations instead of

dismissing her.  She argues that the school could have: 1) adjusted the rotation paper to an A;

2) allowed her to resubmit her rotation paper for a grade above a 3.0; 3) evaluated the

incorrect paper she resubmitted; or 4) permitted her to retake rotation six entirely.  We will

---

    [4] The McDonnell Douglas test usually applies in the employment context, and our analysis of
the background law will frequently refer to the defendant as the employer.  Section 1981 also applies
to contracts with students, Tripp v. Long Island University, 48 F. Supp. 2d 220, 224 (E.D.N.Y.
1999), Goodman v. Bowdoin College, 380 F.3d 33, 43 (1st Cir. 2004), and thus, we apply the
McDonnell Douglas test in this context as well.

address each of these issues in turn.

### A.      Adjust Rotation Six Paper Grade

Jafar argues that Kings should have granted her an A on her sixth rotation paper after discovering that Dr. Sauls reduced her grade based on criteria that had not affected her fourth or fifth rotation papers.  She maintains that the college had the discretion to reconfigure the grade, and its failure to do so was inconsistent with Dr. Feudale's promise that Jafar would not be penalized for school errors.  She further argues that she school has re-graded materials submitted by individuals outside the protected class under similar circumstances.  We disagree on each point, primarily because Jafar mischaracterizes the nature of the school's 'error.'

In her letter offering remediation, Dr. Feudale stated, "Your paper format is incorrect and you do not reference within the paper as required.  These same errors were present on the last several papers but were not picked up, which is our error.  You will not be penalized for our past errors." (Pl. Ex. P-FF-1.)  Dr. Feudale then proceeded to offer remediation for rotation six.  Thus, Dr. Feudale did not promise to reevaluate her sixth rotation paper, but promised not to reevaluate the earlier papers and permitted her to remediate rotation six.  Accordingly, the school's decision to offer remediation instead of re-grading the paper was not inconsistent with Dr. Feudale's promise.

Next, Jafar argues that under similar circumstances the school reevaluated an exam submitted by Carlene Walters, and African American student.  Jafar maintains that in both

her situation and Waters', the grade was erroneous because of a teacher error, but the school

reevaluated Waters' grade but not hers.  In Waters' situation:

> Father Grimes informed Theresa Peck, Liz Lott, and Frances that Carlene
> Waters is to be reinstated into the PA program.  Father explained that after
> reviewing the evidence again, he felt that Carlene should be given credit for
> those questions on her end-of-rotation exams that were accidentally marked
> incorrect and had no right answer even though she contested the grades after
> she was dismissed.

(Pl. Ex. GG.)

Thus, the school reevaluated answers that were accidently marked incorrect. Jafar's sixth

rotation paper, however, was not accidently marked incorrect but was given a poor grade

because Jafar made undisputed errors.[5]  The error in Jafar's case was the failure to recognize

her errors soon enough, not an accidental poor marking.  Thus, Waters was not similarly

situated.

Furthermore, Jafar has produced no evidence that the school reevaluated any paper

that Dr. Sauls marked poorly for citation errors.   Dr. Sauls consistently reduced grades for

citations errors, and Mrs. Easton was more lenient.  (Feudale Dep. 60-61.)   Of the 99

students whose grades were reduced for failing to reference, the school did not reevalute one.

(Def. Ans. Interrogatories 3.1-3.99.)

Accordingly, we find that Kings' decision not to reevaluate Jafar's rotation paper

grade would not allow a reasonable juror to disbelieve that Kings dismissed Jafar for her

poor academic performance or to believe that discrimination was a motivating factor in the

---

[5] Furthermore, although protocol warranted Jafar's dismissal after her sixth rotation, she was
allowed to remediate.  Thus, she was dismissed based on her sixth rotation paper.

dismissal.

### B.      Rotation Six Maximum Grade

Jafar argues that the school treated her less favorably than other similarly situated individuals outside her protected class because it limited her remediation grade for the sixth rotation paper to a 3.0.

First, whether or not Jafar was limited to a 3.0 had no effect on Kings' decision to dismiss her because she never resubmitted the paper. "In determining whether similarly situated nonmembers of a protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria identified . . .as the reason for the adverse action." Simpson, 142 F.3d at 647. Thus, the limit placed on her remediation paper does not call into question the motivation for ultimately dismissing her because it was not a factor in this decision. Focusing on the criteria identified as the reason for dismissal, *i.e.* Jafar's poor academic performance and failure upon remediation, Kings treated Jafar favorably to those outside her protected class. Jafar was not dismissed until she failed three rotations and was offered remediation for the third. Caucasian student Christine Grynkiewicz was dismissed after failing two rotations. (Def. Ans. Interrogatory 4.2.) Caucasian student Paul Price was dismissed after failing two rotations and was not offered remediation. (Def. Ans. Interrogatory 4.4.) Caucasian student Angela Kane was dismissed after failing only two rotations. (Def. Ans Interrogatory 4.10.)

Even if the remediation grade limitation was a factor in the decision, Jafar has not

10

produced evidence that would allow a reasonable jury to believe the school selectively

applied this limitation based on race.  Jafar notes that Carlene Waters and Steven Cahoon, a

Caucasian student, were permitted to remediate for grades above 3.0.  A plaintiff can

establish that enforcement of a policy is pretext for discrimination if that policy was not

enforced against similarly situated individuals outside the protected class.  Delli Santi v.

CNA Insurance Co., 88 F.3d 192, 203 (3d Cir. 1996).  In Delli Santi, the defendant

terminated the plaintiff's employment because he presented receipts for reimbursement for

travel indicating that he had gas mileage for travel of less than ten miles per gallon, which the

defendant deemed a misrepresentation.  Id.  The court found that a rational jury could believe

this reason was pretext for discrimination because the defendant failed to investigate,

discipline, or terminate any one of over 200 other employees who engaged in the same

practice.  Id.

Here, however, Kings did not single out Jafar among other similarly situated students.

Of the ninety nine students who received reduced grades for citation errors, the school did

not allow a single one to remediate for a grade above a B.  (Def. Ans. Interrogatories 3.1-

3.99.)  Every single time the student received a grade deduction.  (Id.)  On no occasion did

Kings reevaluate the paper.  (Id.)  On one occasion it offered remediation to a Caucasian

woman, but limited her to high grade of a B.  (Id.)  Thus, Jafar was treated exactly the same

as those similarly situated.  Steven Cahoon and Carlene Walters did not receive grade

reductions for poor citations, and thus, they are not similarly situated.  Steven Cahoon was

11

allowed to remediate a paper for a maximum score of 87 when he submitted a paper when he

did not address the correct topic. (Pl. Ex. 5, Answers to Interrogatories 2.12, 11.2.)  Carlene

Waters was permitted to remediate her seventh rotation preceptorship with no maximum

grade because of possibility that her exam answers were accidently marked incorrect.  (Pl.

Ex. GG; Ex. 5, Answers to Interrogatories 1.5.)  Jafar produced no evidence that either of

these students were allowed remedial grades above 3.0 after making citation errors.

Furthermore, we cannot compare Jafar to Waters and Cahoon without taking into

account the treatment of other students in the program. "[E]vidence of the more favorable

treatment of a single member of a non-protected group . . . can not be viewed in a vacuum."

 See Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998).  "The plaintiff can not 'pick

out one comparator [treated more favorably] amid a sea of persons treated the same as her' to

establish a jury question." Id. at 646.  In Simpson, the plaintiff, a store manager for the

defendant jewelry store, was demoted for failing to meet her store sales quotas.  Id.  Simpson

alleged this reason was pretext for age discrimination.  Id.  She noted that another similar, but

younger, store manager was not demoted even though the comparator had lower valuation

scores for sales and they both received an overall rating of "good." Id.  The court found the

single comparator insufficient to create a genuine issue of material fact.  Id.  "[T]he more

favorable treatment of one younger manager as compared to one older manager may not be

sufficient to infer age discrimination.  This is not to say that evidence of more favorable

treatment of a single member of a non-protected group is never relevant, but rather that the

evidence can not be viewed in a vacuum." Id.  For example, "a black plaintiff cannot

establish racial discrimination by singling out one white person who was treated more

favorably when there were other white persons who were treated less favorably than other

black persons." Id. at 646.   The ultimate inquiry is whether the decisions were motivated by

invidious discrimination.  Id.  at 646.  Therefore, a plaintiff must produce evidence that more

than a single member outside the protected class who was treated differently.  Id.  "[T]here

still must be some evidence from which to infer discrimination apart from the fact that some

members of one group are sometimes treated better and sometimes treated worse than

members of another group."  Id.  Thus, the Simpson court reviewed other similarly situated

store managers, and noted that thirty-five other managers were demoted for poor store sales

performance, and of these thirty-five all were younger than Simpson and thirty four were

outside the protected class.  Id.  "Simply stated, Simpson can not pick and choose a person

she perceives as a valid comparator who was allegedly treated more favorably, and

completely ignore a significant group of comparators who were treated equally or less

favorably than she."  Id.

Here, no reasonable jury faced with the record on the whole could conclude that Kings

applied its policies selectively based on race.  Even though two students who received grade

reductions were allowed to remediate for grades over a 3.0, neither of these students' grades

were reduced based on citation errors.  On the 99 occasions where a student's grade was

reduced for citations errors, not one student was allowed to remediate for a grade above a

13

3.0.  (Pl. Ex. 4, Ans. Interrogatory 3.)  Although Cahoon was allowed to remediate for an 87

after making formatting errors, three other Caucasian students were limited to a B upon

remediating research papers.  (Def. Ans. Interrogatory 11.1-4)  The one student outside

Jafar's protected class who was permitted to remediate a paper after making citation errors

was limited to a B just as Jafar.  (Def. Ans. Interrogatory 3.20; 11.4).  Thus, the evidence on

the whole does not evince a discriminatory motive and demonstrates that Kings applied its

policies regarding remediation and dismissal in a race-neutral manner.

### C.    Evaluate Incorrect Paper

 Jafar believes that Kings erred by refusing to evaluate the masters paper that she

incorrectly submitted during remediation instead of her rotation paper.  She argues that the

school should have known she misunderstood the direction and submitted the wrong paper,

and thus accepted the wrong paper to satisfy her remediation assignment.  The school refused

to do so because Dr. Feudale believed that her direction to Jafar was clear.

 What the school should have done, in Jafar's mind, is not the issue.  "[T]he question is

not whether the [school] made the best, or even a sound. . .decision; it is whether the real

reason is [discrimination.]"  Simpson v. Kay Jewelers, 142 F.3d 639, 647 (3d Cir. 1998).

The school's direction to Jafar was clear, and its refusal to allow her another chance to

remediate is not inconsistent with its decision to terminate her for repeated academic failures.

Moreover, Jafar has produced no evidence that the school ever provided such an

accommodation to any student, much less a student outside of her protected class.

14

### D.      Retake Rotation Six Entirely

Finally, Jafar argues that the school's failure to permit her to entirely retake her sixth rotation was discriminatory because it allowed Carlene Waters to do so.  As noted *supra*, Carlene Waters was allowed to remediate because of the possibility that her exam answers were accidently marked incorrect.  Jafar's sixth rotation paper had unquestioned errors. Furthermore, the school did not permit any other student to remediate an entire rotation for failing to employ the correct citation format.  In the only other circumstance where a student was offered remediation because of improper citation, the student was permitted to resubmit the paper only.  (Pl. Ex. 5, Answers to Interrogatories 3.20.)  Therefore, we find that the school's decision to allow Jafar to remediate only her rotation paper and exam instead of permitting her to remediate her entire rotation neither calls into question its reason for dismissing her nor creates an issue of fact that her dismissal was based on race.[6]

### V.      Conclusion

We find that Jafar has failed to create a genuine issue of material fact that Kings dismissed her based on her race.  Kings explains that it dismissed her because of her poor academic performance.  It is undisputed that Jafar was on academic probation after failing two rotations.  It is further undisputed that she failed to achieve the necessary GPA on her

---

[6] Morever, based on her other grades in rotation six, permitting her to retake the rotation entirely would have been pointless.  In rotation six, Jafar received a 4.0 on her take home exam and her preceptor evaluation.  She received a 3.8 on her logs.  Her poor cumulative grade resulted solely from her 2.0 on her rotation paper and her 1.0 on her mock board exam.  Thus, the school allowed her to remediate those portions of the rotation on which she scored poorly.

sixth rotation, and thus she failed a third time.  The school then offered her the opportunity

for remediation by allowing her to resubmit her rotation paper for a maximum grade of 3.0

and to retake her end-of-rotation exam.  Jafar failed to achieve the necessary score on her

remedial examination and she did not resubmit her rotation paper despite specific

unambiguous directions from Dr. Feudale.  Although the school gave Jafar a chance at

remediation, she failed because she did not turn in the correct paper.  See Bell v. Ohio

University, 351 F.3d 240, 254 (6th Cir. 2003) (finding that school's great lengths to assist

failing student contrasted with student's claims of purposeful discrimination).  "[A]n

employer would be entitled to judgment as a matter of law . . .  if the plaintiff created only a

weak issue of fact as to whether the employer's reason was untrue and there was abundant . . .

evidence that no discrimination had occurred."  Goodman v. Pennsylvania Turnpike

Commission, 293 F.3d 655, 673 (3d Cir. 2002).  Kings has presented undisputed evidence

Jafar did not satisfy the academic standards and was afforded the opportunity for

remediation.  Moreover, the school's academic disciplinary history reveals that the school's

policies were not applied selectively based on race.  Although it is possible that Kings could

have granted further accommodations to Jafar, what it could have or should have done is not

the appropriate inquiry.  Since Jafar never submitted her remediation paper, she would have

failed the remediation regardless of whether Kings granted the accommodations.  Therefore,

we find that Jafar has failed to create a genuine issue of material fact and we will grant

summary judgment for Kings.  An appropriate order follows.

16

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| HUDA JAFAR, | | : | No. 3:04cv862 |
| | Plaintiff | : | |
| | | : | (Judge Munley) |
| v. | | : | |
| | | : | |
| KINGS COLLEGE, | | : | |
| | Defendant | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## <u>ORDER</u>

**AND NOW**, to wit, this 30th day of June 2006, Defendant's Motion for Summary Judgment (Doc. 24) is hereby **GRANTED**.  The Clerk of Court is directed to enter judgment on behalf of the defendant and close this case.

BY THE COURT:

s/ James M. Munley
JUDGE JAMES M. MUNLEY
United States District Court